# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CINDY R. TINSLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:16-cv-01350** |
| | ) | **Judge Aleta A. Trauger** |
| **CATERPILLAR FINANCIAL SERVICES** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM & ORDER

Pending before the court is a Motion for Summary Judgment filed by the defendant, Caterpillar Financial Services Corporation ("CFS") (Docket No. 23). The motion was previously granted by the court (Docket No. 34). The Sixth Circuit Court of Appeals affirmed this court's grant of summary judgment to the defendant on the plaintiff's Americans with Disabilities Act failure to accommodate and forced retirement claims, but remanded the case for further consideration of her Family Medical Leave Act ("FMLA") retaliation claim. (Docket No. 40.) The court ordered supplemental briefing, which has now been filed. (Docket Nos. 43, 46, 47.) For the reasons discussed herein, the motion will be denied and the FMLA retaliation claim shall proceed to trial.

## BACKGROUND[1]

Cindy Tinsley is a former employee of CFS. She started at the company as a paralegal in 1997 and eventually moved to the company's business side. By October 2013, she had worked

---

[1] Facts relevant to resolution of CFS's motion were previously set forth in the court's February 26, 2018 Memorandum & Order (Docket No. 34). They are recounted and supplemented (based on the parties' additional filings) here.

her way up to the position of Business System Analyst III. In that role, Tinsley worked on the Four Pillars Project (the "Project") with a team of seven other business analysts. The Project involved developing, testing, and deploying new software platforms for CFS's various business functions. Each team member had background experience and specialization in different functional areas. Tinsley's specialization was in Special Accounts, dealing mainly with collections. The team operated under the supervision of a Global Process Track Manager, Paul Kaikaris, and a Team Lead, Amy Clendenon. Kaikaris provided overall leadership, while Clendenon was responsible for direct guidance and supervision of the team.

The team spent the project's first seven months familiarizing themselves with the new software systems' capabilities. They then reviewed those capabilities with the software's eventual users, in order to identify gaps between the capabilities and the users' needs. The business analysts would draft a Functional Design Document ("FDD") that documented the required changes. Initially, business analysts worked primarily to develop software solutions for gaps within their realm of specialization. In April 2015, the team began to test the solutions in a major test, Systems Validation Event 1 ("SVE1"). Due to the high volume of testing and the potential for long periods of idle waiting time, Kaikaris and Clendenon shifted tacks by implementing "cross-testing." They had each business analyst train the rest of the team on his or her area of specialization, allowing each business analyst to run any test scheduled on a given day.

Tinsley disagreed with this decision, believing that team members should only conduct tests within their realm of specialization. Cross-testing was not the only source of stress for Tinsley. Another business analyst on the team, John Wallace, had left the team some months prior, and his job duties and responsibilities were transferred to Tinsley. In addition, Tinsley was handling increased responsibilities at home related to after-school care for her grandchildren. On

April 15, 2015, Tinsley emailed Kaikaris to outline her concerns. She noted that her change in family obligations restricted her ability to work more than 50 hours per week and stated that her responsibilities at work—particularly those beyond her specialization—were negatively impacting her work, sleep, and health. She requested that she be transferred off of the Project and placed back in a collections-related role.

Kaikaris met with Tinsley upon receiving the email and agreed to lighten her workload and otherwise support her as needed. On April 21, 2015, Tinsley submitted a doctor's note from her personal physician, excusing her from work for a confidential medical condition. (Docket No. 26-1, Ex. 5.) She took four days of leave pursuant to the FMLA and returned the following Monday, April 27, 2015. On May 4, 2015, Tinsley met with Kaikaris and Clendenon, who reassigned three FDDs from Tinsley's workload in an effort to ease her workload burden. In a later email to Human Resources Generalist Chinh Brown, Tinsley stated that this "greatly reduced" her stress level. (Doc. No. 26-1, Ex. 10.)

Tinsley proceeded with the rest of the team into the SVE1 testing event. On May 28, 2015, Kaikaris awarded Tinsley a "Cat Buck," a small incentive used by CFS to praise employees performing exemplary work or exceeding expectations. (Docket No. 46-1 at 2 (Supplemental Affidavit of Cindy Tinsley).) CFS employees receive a small number of Cat Bucks every quarter to give to other employees they perceive as doing their job well.[2] (*Id*.) Cat Bucks can be redeemed in the CFS cafeteria and on-site store. (*Id*.) Each Cat Buck includes a checklist of five "Customer Experience Guiding Principles," and the employee awarding the Cat Buck checks the principle she believes the recipient's work exemplifies. (*Id*., Ex. B.) On the Cat Buck he awarded Tinsley,

---

[2] It is not clear from the record whether Cat Bucks are awarded only by supervisory employees to subordinates, or if they are given to all employees to disburse at their discretion.

Kaikaris checked "Follow through builds trust" and added the annotation "ALM," a reference to the software on which Tinsley was working at the time. (*Id*.) Kaikaris told Tinsley when he awarded her the Cat Buck that she was one of the only testers following the prescribed methodology. (*Id*. at 4.)

In an attempt to ameliorate the stressful conditions surrounding SVE1, Kaikaris distributed stress balls to the business analysts. Some business analysts and other employees—and, on at least one occasion, Kaikaris himself—took to bouncing the balls on the floor and other surfaces, a source of great distraction to Tinsley. Tinsley was similarly frustrated by various other downtime behaviors on the part of her co-workers, which included physical activities such as headstand push-ups and arm-wrestling. On July 2, 2015, at a daily team meeting, Kaikaris opened the floor to team members, and Tinsley voiced her concerns. She described the work environment as a "kindergarten" and explained that such behavior prevented her from concentrating and completing her work. (Doc. No. 26-1, Ex. 9.) Kaikaris addressed the issue, and team members subsequently stopped bouncing the balls around Tinsley.

The following week, Kaikaris and Clendenon met with Tinsley to discuss her performance during SVE1. Kaikaris and Clendenon raised several issues related to Tinsley's purported failure to abide by the prescribed testing methodology and protocol. As to methodology, Kaikaris stated in his deposition that he and Clendenon showed Tinsley accounting tests that showed that Tinsley's testing was deficient.

> Q. And what was the problem with the progress of Ms. Tinsley's test events?
>
> A. Cindy was getting through a very large number of tests in a short period of time. And there's a check and balance that we have with our finance analysts that check the accounting after the business tests. Based on her velocity, there were— there were—excuse me. It was evident that there were deficiencies within her testing.

Q.   How was it evident?

A.   The accounting tests that followed her business tests showed that.

Q.   How did those tests show that?

A.   Through the accounting check of those tests.  In other words, errors—errors on the accounting side were evident due to the balance, the credit-debit balance, the post-accounting check that the tests ran through.

Q.   Did you show Ms. Tinsley those accounting tests when you discussed with her in meeting with Ms. Clendenon?

A.   Yes.

Q.   How many test events were improperly done, according to the accounting tests at that time?

A.   I do not recall the number of tests.

Q.   How many accounting test checks did you show Ms. Tinsley during that meeting?

A.   I don't recall.

Q.   Less than five?

A.   I don't recall.

(Docket No. 26-2 at 38.)  Tinsley denies that she was shown any accounting tests.[3]  Kaikaris and

Clendenon also expressed concern that Tinsley had left work early without permission on two

---

[3] Tinsley's denial is unequivocal.  (*See, e.g.,* Docket No. 30 at (Plaintiff's Response to Defendant's Statement of Undisputed Material Facts) ("**Denied** that tests were shown to her revealing test error.") (emphasis in original).)  CFS contends that Tinsley does not adequately dispute this fact under Local Rule 56.01(c)(3), which states that each disputed fact must be supported by specific citation to the record.  Tinsley cites the portion of her deposition testimony in which she recounts the initial meeting with Kaikaris and Clendenon.  CFS is correct that Tinsley does not cite testimony explicitly stating that she was not shown the tests.  But Tinsley was not explicitly asked in her deposition about the accounting tests.  Instead, she was asked what she recalled being discussed during the meeting.  (Docket No. 26-1 at 82 (Deposition of Cindy Tinsley).)  She responded with an averment that did not include mention of any tests.  (*Id*. at 82–83.)  She was then asked specifically about conversations regarding her testing performance.  (*Id*. at 85 ("[C]an you just tell me the best you can recall what was discussed at these meetings about your general

occasions. Tinsley denied both charges, insisting that she was performing adequately and complying with team attendance requirements.[4]

Later that month, Kaikaris and Clendenon again met with Tinsley to deliver her mid-year performance review. It was uncommon—but not unprecedented—for multiple supervisors to deliver a review. Kaikaris and Clendenon asked why Tinsley was taking longer than other analysts to perform her tests, which confused Tinsley, given that, in the prior meeting, Kaikaris had noted that she was performing tests too quickly. (Docket No. 46-1 at 3.) Kaikaris explained that he did not understand why Tinsley, unlike other analysts on the team, needed to arrive at 6:30 am to prepare for 8:00 am tests. (Docket No. 26-1 at 239.) Tinsley responded that she used that time to answer e-mails, work on FDDs, or complete other tasks, not to prepare for tests. (*Id*.)

Kaikaris and Clendenon informed Tinsley that she would receive a "Did Not Meet Performance Expectations" rating, based on the concerns they had communicated in the previous meeting. Specifically, they detailed that Tinsley was not following the established testing process

_____

performance?").) Again, she responded with an averment that did not include mention of any tests. (*Id*. at 85–86.) She was asked whether she remembered anything else discussed at the meeting. (*Id*. at 86 ("Do you recall anything else they talked to you about during these meetings?").) Yet again, she responded with an averment that did not include mention of any tests. (*Id*. at 86–87.) Finally, she was asked if there were "[a]ny other things that you have a specific recollection of discussing" with Kaikaris and Clendenon. (*Id*. at 88–89.) She responded, "No." (*Id*. at 89.) The court reads Tinsley's absence of recollection as supporting her denial, insofar as she does not remember being shown the tests. Her denial of CFS's statement of fact complies with Local Rule 56.01.

[4] While Tinsley concedes that she left work early on two occasions, she disputes that the absences constituted an attendance problem. (Docket No. 46-1 at 4.) She alleges that, on the first occasion she left following lunch, after she had an allergic reaction to food brought into the CFS office. (*Id*.) And she alleges that, on the second occasion, she left early after she had arrived earlier than usual, worked through lunch so that she could reach her standard eight-and-a-half hours worked, and completed her tests for the day. (*Id*.) The record confirms that, on the date of the second absence, June 26, 2015 (a Friday), Tinsley emailed Kaikaris and Clendenon at 2:40 pm to alert them that she was leaving for the weekend. (Docket No. 26-1, Ex. 6.) Tinsley avers that she was a salaried employee who worked 45–50 hours per week (Docket No. 46-1 at 4), typically from 6:30 am to 4:00 pm (Docket No. 26-1 at 78).

and methodology, putting test quality at risk. In the official performance review document, Kaikaris wrote:

> Cindy has made great contributions to the 4 Pillars project during the first 18 months of her assignment, however the testing aspect of her role, coupled with the high demand for multi-tasking project deliverables, has resulted in an uncomfortable job fit. During the first half of 2015, her performance related to preparing for and executing the Solution Validation testing event (SV1) for North America did not meet performance expectations. She did not follow the established testing process/methodology, putting test quality at risk. Prior to beginning the event, accommodations were made for Cindy as she was experiencing elevated stress levels. A portion of her tasks were distributed to other analysts including [FDD] writing and follow-up. This mid-year rating is an anomaly and should not detract from her past accomplishments and future opportunities. With an action plan in place, I'm confident that Cindy can return to an expected level of performance by year-end.

(Docket No. 26-2, Ex. 2.)[5]

On August 14, 2015, Kaikaris again met with Tinsley and provided her with a Performance Improvement Plan ("PIP"), as stipulated by company policy when an employee receives a "Did Not Meet Performance Expectations" review rating. The PIP outlined the disputed deficiencies Kaikaris and Clendenon identified in their previous meeting and prescribed a process for monitoring Tinsley's performance for the remainder of the year. It stated that Tinsley needed to follow proper protocol related to testing and improve certain "value-based competencies" drawn from a performance-based rubric:

**Follow the established AQA (Application Quality Assurance) Process**

**Needs Improvement**:

Need to follow the established AQA (Application Quality Assurance) process for testing and refrain from autonomous and/or impulsive actions while testing. Specifically, gain approval from Team-Lead prior to 1) instructing Tech to change code, configurations, or formulas; 2) opening/closing a defect; 3) obtaining an

---

[5] Tinsley was not shown the review itself, although Kaikaris and Clendenon explained its contents to her in the second meeting. (Docket No. 26-1 at 89–90.)

alternative contract to test. [sic] 4) Tests must be witnessed by Finance analysts as prescribed by the methodology.

. . .

**Improve skill level within the following Value-Based Competencies**

**Needs Improvement**:

Need to improve the following value-based competencies: 1) Dealing with Uncertainty: specifically, *Prefers proven methods and sometimes has difficulty facing change and uncertainty*; 2) Priority Setting: specifically, *Spends his/her time and the time of others on what's important*; 3) Customer Focus (internal): specifically, *Uncomfortable with complaints, criticisms, and special requests.*

(Docket No. 26-2 at 77 (emphasis in original).)

Tinsley refused to sign the document, maintaining that it was inaccurate on all accounts. In her deposition, she explained that two of her purported failures to follow the proper testing methodology were based on misunderstandings. The first was that she allegedly instructed a technical analyst to change a formula. According to Tinsley, this misconception was based on an incident in which Tinsley contacted a friend—a CFS technical analyst who was responsible for building the termination formulas used in the SVE1 tests—and asked him a question about whether a formula was calculating correctly. (*See* Docket No. 26-1 at 85 ("So I reached out and asked a question which Amy then turned that around and said you asked him to change a formula that's already in existence, which I never did.").) The second was that she allegedly was beginning tests early, without a finance accountant present to witness them. According to Tinsley, Kaikaris conflated Tinsley's preparatory steps with commencement of the tests themselves. She explained:

That is a misunderstanding. Before I would run a test for terminations, I would mock the test to the point that could I see what the numbers were and I would copy that and put it in Excel so then I could actually use Excel to help calculate to see if this termination is actually doing what it's supposed to do. Paul never could understand that. It took roughly two minutes, but then when the accountant would come in, I would start the process over new because when you're doing a termination in that particular system, you can do a quote as many times as you want

to. . . . And that's part of what Paul couldn't understand. He thought I was going through and doing the whole test before the accountant ever got there and that was not the case. I was simply going in and pulling a quote so that I could use Excel to help ensure the numbers were correct.

*Id*. at 84. Tinsley also stated that she never obtained an alternate contract to test without Clendenon's approval. (*Id*. at 93.) The upshot of Tinsley's testimony regarding testing methodology and protocols is that she followed them rigorously:

> Q. My question in terms of following this AQA process: Was this an unreasonable expectation?
>
> A. No, because I followed it.
>
> Q. Is it an expectation that you felt you could meet without any undue difculty?
>
> A. It's an expectation that I was meeting, had met and had no problems with.

(*Id*.)

On August 17, 2015, Tinsley met with Chinh Brown, the H.R. representative, to discuss the review. Tinsley told Brown that she was concerned about her workload and stress levels, and again complained about business analysts bouncing the stress balls. Tinsley followed up the meeting by sending Brown a letter outlining her perceived successes on the Project (some of which, she stated, were not acknowledged during her review), complaining about her workload, and accusing Kaikaris of retaliating against her via the review process for her complaints about the team work environment. She concluded the letter with the following request:

> It is because of all of the above that I do not agree with his assessment or feel comfortable continuing to work under his supervision and am herein requesting the "Did Not Meet Expectation" (sic) rating be changed and that I be restored to my former support manager role in the NABC Special Accounts group at the earliest opportunity.

(Doc. No. 26-1, Ex. 9.) Tinsley followed up with an email to Brown two days later, in which she detailed her interactions up to that point with Kaikaris and further documented her achievements

on the Project. She explained that her April FMLA absence was the result of being "placed under the care of [her] physician for complete mental and emotional exhaustion." (Doc. No. 26-1, Ex. 10.) After acknowledging that the reassignment of the three FDDs greatly reduced her stress level, she elaborated: "Please understand that the work itself was not the primary issue. It was the unrealistic deadlines that pushed me to the point of mental and emotional exhaustion." (*Id*.)

CFS undertook a review of Tinsley's complaints. Brown met with Kaikaris, Clendenon, Kaikaris's supervisor Mary Clements, and Chief Information Officer Jerry Brown to investigate Tinsley's allegations that her performance review was inaccurate and retaliatory and that her workload was excessive. Upon review, Chinh Brown concluded that Tinsley's review and workload were both appropriate. She reported her recommendation to Terry Cook, CFS's Global Employee Relations Manager. The review and workload were upheld. The record does not include any further specifics about the review process. When asked about the review in his deposition, Cook stated:

> A. I don't recall specifics about the attendance issues. What I do recall from Chinh was that the main issue around the performance was Cindy not following the proper protocols on the testing.
>
> Q. And do you remember any specifics regarding what protocols she was not following?
>
> A. No.
>
> . . .
>
> A. Chinh came back to me after she investigated Cindy's complaints. She explained the rationale for the midyear review. And her recommendation to me was that it was an appropriate review, and that the aspects of the review were correct. So given that the review was correct, you know, that we supported the did-not-meet review. And again, that's a decision that the line management makes, and we would investigate it for appropriateness, that a performance improvement plan would be required.

(Docket No. 29-4 at 41, 45 (Deposition of Terry Cook).)

Two weeks after her contact with Chinh Brown, Tinsley submitted a letter from her physician excusing her from work from September 2, 2015 to September 8, 2015. While on FMLA leave, Tinsley submitted another letter to the Human Resources department, dated September 7, 2015, meant to further clarify her situation. She again stated that her initial FMLA leave was necessitated by "extreme emotional and mental duress due to the over-excessive workload that was now growing and the unrealistic deadlines that [she] was expected to meet." (Doc. No. 26-1, Ex. 12.) Tinsley reiterated that the reassignment of the three FDDs provided "some relief" and explained that, with medication, she was able to function, despite an increasing workload thereafter until Kaikaris distributed the stress balls. (*Id*.) Tinsley noted that she did not believe that the bouncing of the stress balls and other behavior which, in her description, collectively constituted a hostile work environment, were done out of "intentional malice" but, rather, were a result of "reckless indifference" to her mental and emotional well-being. (*Id*.) She again requested reassignment to a position not under the supervision of Kaikaris.

Two days later, on September 9, 2015, Tinsley submitted a letter from her physician further excusing her from work through September 22, 2015, for an unspecified condition. Tinsley requested and received FMLA leave for the period spanning from September 2, 2015 through October 8, 2015. On October 6, 2015, Tinsley submitted another letter from her physician, this one medically clearing her to return to work. Her physician wrote:

> At this time, [Tinsley] has stabilized medically. In my opinion, she is able to return to work effective October 7, 2015 and function at full capacity. However, I strongly recommend her working in a different environment and specifically under a different manager. She describes a work environment and management style that was insensitive and at times hostile.

(Doc. No. 26-1, Ex. 19.) Tinsley returned to work on October 7, 2015, and met with Norma Hawk, a Compensation and Benefits Consultant. Tinsley got the impression from Hawk that CFS

commonly reassigned people for disability-related reasons.  (Doc. No. 26-1, pg. 129.)  Tinsley understood Hawk as saying that such an accommodation could be available to Tinsley, although they did not have an in-depth discussion, and Tinsley knew that Hawk did not have authority to approve such an accommodation.  (*Id.*)

Tinsley also met with Cook, reiterating to him that she could not work with Kaikaris as her supervisor.  She told Cook that she would be able to work in her same position as a Business Analyst III on the Project under the supervision of another manager, Drew Rosenboro.  Tinsley explained in her deposition:

> I said that that would be something that I could do.  It would keep me involved in the projects so they wouldn't lose my knowledge.  But I had enough familiarity with Drew to know that he would not overload me the way I had been overloaded.

(Doc. No. 26-1 at 131–32.)  Cook also asked Tinsley if she would feel more comfortable working under Kaikaris if a third party—Mary Clements, Kaikaris's supervisor—oversaw their working relationship, to which Tinsley said no.  Tinsley did not have faith in that process working because she thought Kaikaris had convinced Clements that Tinsley deserved a poor performance rating at her mid-year review.  Tinsley told Cook that, if she was required to continue working under Kaikaris, she would accept CFS's Voluntary Retirement Enhancement Program ("VREP") and retire early.[6]

Cook reached out to Rosenboro to see whether Rosenboro could accommodate Tinsley by adding her to his team.  Rosenboro agreed to do so.  Cook sought approval for Tinsley to transfer to Rosenboro's team, but the request was denied by Clements.  According to Cook, Clements

---

[6] VREP is an early retirement enhancement package available to employees in good standing.  Tinsley required an exception to qualify for VREP because of her "Did Not Meet Performance Expectations" mid-year review rating.  That exception was granted, and Tinsley was offered VREP in October 2015, but she declined the offer.

denied the request because Rosenboro's team "was [doing] essentially the same type of work that Paul Kaikaris's team was doing, and [ ] the concerns that they had with Cindy's performance and her seeming unwillingness to follow the protocols and the testing would be the same on Drew's team." (Docket No. 29-4 at 66–67.) Clements indicated that she would consider transferring Tinsley to Rosenboro's team if Tinsley came back to work and demonstrated that she was able to follow the protocols set forth by Kaikaris. (*Id*. at 67.) Cook did not tell Tinsley that Rosenboro had agreed to take her onto his team or that Clements had blocked the move. (*Id*. at 68.) Tinsley did not report to work the following day, using accrued vacation days for absences on October 8 and 9.

On October 8, Tinsley emailed Cook and Chinh Brown to inform them that she had been released to return to work. She wrote:

> My doctor has released me to work, under a different manager, as of 10/7/2015. . . [T]he early retirement option will be one that is only taken if [CFS] continues to insist that I go back to work under the same manager and continues to uphold the "did not meet expectations" rating.

(Doc. No. 26-1, Ex. 21.) Tinsley was scheduled to report back to work on October 12, 2015, but did not return until October 14. Upon return, she met with Cook and Chinh Brown and followed up later that day via email with a point of clarification. She wrote:

> I do want to ensure that you understand the reason that both my physician and my counselor are strongly recommending that I not go back to the same role under the same manager is **<u>not</u>** because of the mid-year rating but, because of the severe mental and emotional duress brought on by months of an over-excessive workload, unrealistic deadlines, a hostile work environment and a managers (sic) reckless indifference to my mental and emotional well-being. The rating itself is a separate issue.

(Doc. No. 26-1, Ex. 23) (emphasis in original). Cook gave Tinsley the option of seeking additional medical leave if she did not feel ready to return to work, which Tinsley accepted. Tinsley forwarded an email from her counselor the following day, which stated that Tinsley should

continue receiving therapy for the following eight weeks with a minimum of one session per week. The email did not state that Tinsley was medically unable to work or restricted from working in any way. However, Tinsley requested and received an additional eight weeks of FMLA leave. Hawk informed Tinsley via email that her twelve weeks of FMLA-entitled leave would be expended on November 25, 2015. Cook followed up to note that CFS would extend her leave unpaid through December 11, 2015, with the expectation that she return to work the following Monday.

On December 11, Tinsley requested eight more weeks of leave and forwarded another email from her counselor outlining a similar eight-week plan. Chinh Brown responded that CFS was willing to grant one additional week of unpaid medical leave, which Tinsley accepted. Tinsley reported back to work the following week, on December 21, 2015. Within two hours, she told Brown and Cook that she was unable to work. She stated in her deposition that she "fell apart" due to "the environment, just knowing the workload that I was going to be expected to handle." (Doc. No. 26-1, pg. 155.) One week later, Tinsley submitted a document from her physician and requested leave from December 28, 2015 to February 14, 2016, due to a "confidential medical condition" later identified as Post-Traumatic Stress Disorder ("PTSD"). (Doc. No 26-1, Ex. 29.) This request was denied. Cook emailed Tinsley on January 7, 2016, explaining that he understood Tinsley to be seeking additional leave due to stress caused by working for Kaikaris, which was not reasonable grounds for further leave, given the amount of work Tinsley had already missed. Tinsley responded two days later, again requesting additional leave. Cook responded the next day that Tinsley was expected to return to work the following day, January 11, 2016. Tinsley responded: "Since you have given me no other alternative, please process my retirement effective 1/11/2016." (Doc. No. 26-1, Ex. 31.) Brown met with Tinsley the following day to process her

retirement.  Tinsley stated that she retired because she "could not handle the overburdened workload."  (Doc. No. 26-1 at 173.)  In total, Tinsley received 18 weeks of leave.

On December 23, 2015—prior to her retirement—Tinsley filed a Charge of Discrimination with the EEOC.  On July 16, 2016, Tinsley filed suit, alleging failure to accommodate under the Americans with Disabilities Act ("ADA") and forced retirement and retaliation under the FMLA. (Doc. No. 1.)  On February 26, 2018, the court granted summary judgment on all three counts in CFS' favor.  The Sixth Circuit affirmed dismissal of the failure to accommodate and forced retirement claims, but remanded the FMLA retaliation claim for further consideration.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party."  *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's

proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## ANALYSIS

The FMLA should not be "construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B). Likewise, the right to non-interference with medical leave is not absolute. "[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting that request." *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003) (citation omitted).

In evaluating adverse actions potentially motivated by FMLA retaliation, the Sixth Circuit "applies the familiar burden-shifting test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to retaliation claims under the FMLA." *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). The Sixth Circuit found that Tinsley has satisfied the first step of the *McDonnell Douglas* test by establishing a prima facie case of retaliation. (Docket No. 40 at 14.) "If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the adverse employment action." *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997). If CFS does so, Tinsley bears the burden of proving that CFS's "proffered reason for the action was merely a pretext for discrimination." *See id.* (citation omitted).

   **I.      Legitimate, nondiscriminatory reason**

The defendant's burden in asserting a legitimate, nondiscriminatory reason for its adverse action "is one of production, not persuasion, and can involve no credibility assessment." *Parks v. UPS Supply Chain Sols., Inc*., 607 F. App'x 508, 513 (6th Cir. 2015); *see also Bryson v. Regis Corp*., 498 F.3d 561, 571 (6th Cir. 2007). This burden is satisfied if the defendant "'explains what [it] has done or produces evidence of legitimate nondiscriminatory reasons.'" *Romans v. Mich. Dep't of Human Servs*., 668 F.3d 826, 838–39 (6th Cir. 2012) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see also Bryson*, 498 F.3d at 571 ("The defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful [retaliation] was not the cause of the employment action.") (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993)). CFS, supported by Kaikaris's deposition testimony, asserts two reasons for giving Tinsley the negative performance review and placing her on the PIP: (1) Tinsley's allegedly deficient performance in SVE1 testing between May and July, of 2015, ascribable to her failure to follow proper testing methodology and protocol, and; (2) Tinsley's leaving work early without prior authorization on at least two occasions. CFS has satisfied its burden of production by providing these explanations.

## II.    Pretext

Tinsley bears a burden of persuasion to demonstrate that CFS's reasons are pretext for discrimination. *See Carson v. Ford Motor Co*., 413 F. App'x 820, 824 (6th Cir. 2011). "This burden is not satisfied by introducing 'metaphysical doubt' as to the intent of the decision-maker or the adequacy of the process." *Id*. Tinsley is "required to bring forward evidence tending to show that retaliatory animus was the but-for cause" of the negative performance review and PIP.

*See id.* Her "subjective belief that [CFS's] proffered reason[s are] false, and that retaliation was the actual motive, is not sufficient to withstand summary judgment." *Id.*

To demonstrate that CFS's proffered reasons are pretextual, Tinsley may show that they "(1) [have] no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) [were] insufficient to warrant the challenged conduct." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (citation omitted), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *see also Johnson v. Fifth Third Bank*, No. 16-1111, 2017 WL 1244879 (6th Cir. April 5, 2017); *Seay v. TVA*, 339 F.3d 454, 463 (6th Cir. 2003). The Sixth Circuit has explained:

> The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are "factually false." The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff . . . .
>
> The second showing, however, is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

*Manzer*, 29 F.3d at 1084 (internal quotations and citations omitted).

Regardless of which option is chosen, Tinsley must produce "'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally'" retaliated against her. *See Fledderman v. Daiichi Sankyo, Inc.*, 930 F. Supp. 2d 899, 917–18 (S.D. Ohio 2013) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003));

*see also Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 545 (6th Cir. 2008). As "an employer's true motivations are particularly difficult to ascertain" solely from the record, retaliation claims are ordinarily "unsuitable for disposition at the summary judgment stage", once the plaintiff has made out a prima facie case. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004); *see also McKee v. CTel No. 1*, No. 3:17-CV-01566, 2019 WL 1777896, at *8 (M.D. Tenn. Apr. 23, 2019) (Campbell, J.) ("Caution should be exercised in granting summary judgment once a plaintiff has established a prima facie inference of retaliation through direct or circumstantial evidence.") (quoting *Singfield*, 389 F.3d at 564).

With these principles in mind, the court will evaluate CFS's proffered reasons in turn.

### 1. Tinsley's performance

Tinsley contends that CFS has no basis in fact for its proffered reason that her performance during SVE1 was deficient. To satisfy her burden of persuasion, she "must allege more than a dispute over the facts upon which the discharge was based. [She] must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-[retaliatory] reason for the adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488 (6th Cir. 2001). Under the so-called "honest-belief rule," "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 380 (6th Cir. 2017) (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). "The honest-belief rule applies where the employer reasonably relied on the particularized facts that were before it at the time the decision was made." *Id.* (internal quotation marks omitted). "If the employer honestly, albeit mistakenly,

believes in the non-discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent." *Id*.

"[I]n order for an employer's proffered non-discriminatory basis for its employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). "In determining whether an employer reasonably relied on the particularized facts then before it," the Sixth Circuit does "not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Id*. "The evidence that can be used to support the employer's honest belief and the resulting decision varies, but it often involves some kind of investigation." *Hartman v. Dow Chem. Co.*, 657 F. App'x 448, 452 (6th Cir. 2016). "Courts have accepted employment decisions based on other types of evidence, such as records, eyewitness accounts, and information provided by the employee, but they have rejected decisions based entirely on unsupported personal opinions." *Id*. "[T]he key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Stewart v. Kettering Health Network*, 576 F. App'x 518, 522 (6th Cir. 2014) (quoting *Smith*, 155 F.3d at 807).

Tinsley denies that her testing performance was deficient and claims that she followed CFS's prescribed testing methodology and protocols. She points to several pieces of evidence in the record to support her contention that CFS's decision was not reasonably informed and considered with regard to her testing performance. First is the Cat Buck awarded her by Kaikaris. Kaikaris gave her the Cat Buck specifically to praise her testing performance, checking the "Guiding Principle" box for "Follow through builds trust." (Docket No. 46-1, Ex. B.) Kaikaris even went so far as to tell Tinsley that she was one of the only team members who was following

the prescribed testing methodology. (Docket No. 46-1 at 4.) Crucially, Kaikaris gave her the Cat Buck on May 28, 2019, during the period in which CFS asserts that Tinsley's performance declined due to her purported failure to follow the prescribed testing methodology. (*See* Docket No. 25 at 9 (Defendant's Statement of Undisputed Material Fact) ("Between May and July of 2015, Kaikaris and Clendenon observed that Tinsley was not following the prescribed methodology during SV1 testing events and was also failing to follow proper testing protocol (Kaikaris Dep. 36).").) CFS counters that the timing of the award diminishes Tinsley's claim, because the fact that Kaikaris recognized her good performance one month after she took FMLA leave undercuts any inference of animus. But this is precisely the type of dispute over a decision-maker's internal motivations that is not appropriately resolved on summary judgment. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) (acknowledging that discrimination cases present difficult issues best reserved for the trier of fact, as "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes.").

The conflicting reasoning provided by Kaikaris to Tinsley in consecutive July 2015 meetings presents the same problem. In the first meeting, Kaikaris indicated that Tinsley was performing tests too quickly, leading to sloppy results. Kaikaris confirmed in his deposition that Tinsley's testing "velocity" was a root cause of her tests' purported deficiencies. (Docket No. 26-2 at 38.) However, in the next meeting between Kaikaris, Clendenon, and Tinsley, Kaikaris questioned why Tinsley needed significantly more time than other team members to complete her tests. CFS argues that "[t]hese questions are not inconsistent with Kaikaris' and Clendenon's stated concern that Tinsley was not following the prescribed testing methodology." (Docket No. 47 at 4.) But it offers no elaboration as to why. A reasonable jury could conclude that the reasons are contradictory and therefore evidence of pretext. *See Cichewicz v. UNOVA Indus. Auto. Sys.*,

Inc., 92 F. App'x 215, 220 (6th Cir. 2004) (reversing grant of summary judgment and holding that "evidence of pretext may consist of a defendant's changing explanations" for an adverse action).

CFS does not address its review processes in its supplemental briefing. It states that Tinsley was shown accounting tests confirming errors in Tinsley's testing, but Tinsley denies ever seeing them. The record contains no documentation confirming the tests' existence, much less that they were shown to Tinsley. CFS cites only to Kaikaris's deposition testimony when referencing the tests, but Kaikaris's memory with regard to the tests can be described as spotty at best:

> Q. Did you show Ms. Tinsley those accounting tests when you discussed with her in meeting with Ms. Clendenon?
>
> A. Yes.
>
> Q. How many test events were improperly done, according to the accounting tests at that time?
>
> A. I do not recall the number of tests.
>
> Q. How many accounting test checks did you show Ms. Tinsley during that meeting?
>
> A. I don't recall.
>
> Q. Less than five?
>
> A. I don't recall.

(Docket No. 26-2 at 38.) The court "will not blindly assume that an employer's description of its reasons is honest." *Wright*, 455 F.3d at 708. CFS has not provided enough evidence to avoid a genuine dispute of material fact as to whether Tinsley was shown accounting tests objectively confirming that her performance was deficient.

The record does indicate that the performance review and PIP were subject to a review by Chinh Brown, who recommended to Terry Cook that the actions be upheld. But the only

explanation of the review process is that Brown met with Kaikaris, Clendenon, Clements, and CFS's Chief Information Officer Jerry Brown, and subsequently rendered a decision. (Docket No.29 at 53–54.) CFS provides no testimony or documentation detailing what information was reviewed and considered by Brown in forming her recommendation, or by Cook in accepting it. The only light shown on the process comes from Cook's deposition: "[T]hat's a decision that the line management makes, and we would investigate it for appropriateness . . . ." (*Id*. at 45.) The record leaves open the possibility, for example, that the review process included no objective corroboration whatsoever of Kaikaris's and Clendenon's impressions of Tinsley's performance. Without more, the court cannot conclude that CFS "made a reasonably informed and considered decision" in issuing and upholding the negative performance review and PIP. *See Smith*, 155 F.3d at 807; *see also Bryson*, 498 F.3d at 574 (reversing grant of summary judgment where "the record [was] unclear as to what exactly Regis relied upon in making the decision" at issue). Summary judgment will not be granted on the basis of Tinsley's alleged performance deficiencies.

### 2. *Tinsley's absences*

Tinsley contends that leaving work early twice could not have motivated the negative performance review and PIP. In support, she points to the documentation of each. Neither the official performance review document nor the PIP document make any mention of absences or Tinsley's leaving work early. (*See* Docket No. 26-2, Ex. 2, Docket No. 26-2 at 77.) Tinsley, a salaried employee, regularly worked 45-50 hours per week. She states that she left early twice: once after an allergic reaction to food brought into the office by someone else, and another after she had worked a full day and completed the tests assigned to her. Given the omission of these absences from the documents constituting the adverse action that Tinsley challenges, the court finds that a genuine dispute of material fact exists as to whether the absences are pretext for FMLA

retaliation. Summary judgment will not be granted on the basis of Tinsley's unexcused early departures.

**<u>CONCLUSION</u>**

For the foregoing reasons, CFS's Motion for Summary Judgment is hereby **DENIED**.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge